**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

*Attorneys for Plaintiff and the Putative Classes*
(Additional counsel listed on signature page)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DANIELLE CRISCI, on behalf of herself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>LEDISA LLC,<br><br>*Defendant*. | CIVIL ACTION NO.<br><br>**CLASS ACTION COMPLAINT AND JURY DEMAND** |

Plaintiff Danielle Crisci ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant Ledisa LLC ("Ledisa" or "Defendant") and alleges as follows:

## INTRODUCTION

1. Ledisa develops, distributes, markets, and sells an assortment of transdermal wellness patches, which contain natural ingredients and are advertised as a simple and holistic alternative to prescription medications. Plaintiff's instant putative class action complaint concerns Ledisa's marketing and sale of just one type of its patches, the "Dopamine Patches." Ledisa falsely and deceptively misrepresents to consumers that its Dopamine Patches contain "dopamine" and provide positive neurological benefits, when in fact, they do not contain any dopamine and, thus, do not work as advertised.

2. Dopamine is a chemical messenger naturally produced in the body that is responsible for facilitating an array of physical and psychological functions, including regulating mood, driving motivation, experiencing pleasure, and ushering in focus and attention. Low dopamine levels are associated with negative symptoms like mood swings, lack of concentration and initiative, feelings of anxiety, unhappiness, and despair, and are even linked to some of the most globally widespread neurological conditions including, attention-deficit/hyperactivity disorder (ADHD), Parkinson's disease, and restless leg syndrome (RLS).

3. As a result, FDA-approved prescription medications are commonly prescribed to treat many of these diseases. For example, medical-grade transdermal dopamine patches such as rotigotine, which is a dopamine agonist—a chemical compound that mimics dopamine by stimulating dopamine receptors in the brain—is approved to treat RLS and Parkinson's disease. Similarly, stimulants like methylphenidate and amphetamine/dextroamphetamine are used to reduce the symptoms of ADHD by increasing deficient neurotransmitter levels, such as dopamine and norepinephrine.

4. In lieu of these approved medications, Ledisa touts its Dopamine Patches as a natural supplement designed to target and improve mood, energy, focus, and motivation by way of increased dopamine production. On the front label of the product packaging, Ledisa describes its "Dopamine Patches" as containing a "Science Backed Formula." On its website, in publicly available marketing materials, and on social media, Ledisa promises consumers that the Dopamine Patches provide "mood & motivation support"; "support[] focus and drive"; and "support[] your body's dopamine production—so you're able to stay focused with sustained energy" and "feel motivated, not drained."

5. However, Ledisa's advertising and marketing campaign is false, deceptive, and misleading because the Dopamine Patches do not contain any of the actual dopamine chemical whatsoever, and, thus, do not provide consumers with any of the advertised mood benefits. In other words, Ledisa advertises and sells its Dopamine Patches as containing "dopamine," when in fact, they do not. Instead, Ledisa's Dopamine Patches contain a variety of herbal extracts such as lion's mane and rhodiola, which are ineffective at providing the same benefits as the actual dopamine chemical or a dopamine agonist via transdermal delivery.

6. Ledisa's strategy to create a line of Dopamine Patches for sale in the supplement market is not accidental. Since 2025, Ledisa began capitalizing on the public's heightened intrigue for biohacks, and has developed, distributed, marketed, and sold the Dopamine Patches in the online marketplace, targeting health-conscious consumers who desire attaining the positive neurological benefits associated with the "feel good" hormone dopamine.

7. Growing consumer fascination with and desire for holistic alternatives to synthetic drugs has been spurred by factors like limited access to healthcare, increased costs for filling prescription medications, and greater transparency of ongoing developments in scientific literature and clinical trials illustrating the dangerous side effects of long-term prescription drug use. Consumers purchase Ledisa's Dopamine Patches in hopes that they will receive the positive attributes commonly associated with dopamine without any of the aforementioned obstacles, costs, or drawbacks. In reality, however, because the Dopamine Patches do not contain "dopamine" as advertised, consumers do not receive any of the promised health benefits.

8. Plaintiff and similarly situated class members suffered an ascertainable loss of monies as a result of Ledisa's misrepresentations that their Dopamine Patches did in fact contain dopamine. Plaintiff and Class Members would not have purchased the Dopamine Patches absent

Defendant's misrepresentations regarding the composition and efficacy of the Dopamine Patches.

## JURISDICTION AND VENUE

9. This Court has original jurisdiction over this putative class action lawsuit pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d)(2) & (6), because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs; there are more than 100 members of the proposed classes; and at least one member of each proposed classes is a citizen of a different state than Ledisa.

10. This Court has personal jurisdiction over Ledisa because it purposefully directed its activities in this District, committed the wrongful acts alleged herein in New Jersey, regularly conducts business in this District, and has extensive contacts with this forum.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District, and Ledisa regularly conducts business in this District.

## PARTIES

12. Plaintiff Danielle Crisci is a citizen and resident of Metuchen, New Jersey.

13. Defendant Ledisa LLC is a Delaware limited liability company with its principal place of business located in Wilmington, Delaware.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### I. Background of Dopamine's Role in Neurological Mood Disorders

14. Dopamine is a neurotransmitter, or chemical messenger, that carries signals between nerves, created in the brain and gut that is primarily responsible for feelings of pleasure and satisfaction, but is also involved in a host of bodily functions like mood, movement,

motivation, sleep, memory, concentration, lactation, and arousal, amongst many others.[1]

15. A dopamine "rush" or "release" is triggered when one engages in pleasurable activities and serves as the brain's way to teach us the interplay between pleasure and reward.[2] But a deficiency occurs when too little dopamine is released and is linked to negative symptoms of low mood, a lack of motivation and concentration, and depression.[3]

16. Since dopamine plays a critical role in key behavioral aspects, research suggests that malfunctions with the brain's dopamine signaling processes, and, thus, low dopamine levels, may be linked to the development of ADHD and/or at least represents a contributing factor to ADHD symptoms.[4]

17. For this reason, pharmaceutical companies sell FDA-approved prescription medications to treat specific conditions associated with dopamine deficiency, such as Ritalin (methylphenidate), a stimulant used to treat ADHD by increasing dopamine levels in the brain,[5] and Neupro (rotigotine), a transdermal patch used to treat Parkinson's disease and RLS by delivering a dopamine agonist through the skin and into the bloodstream.[6]

18. However, Americans today face many obstacles to attaining access to affordable health care and prescription medications. Polling reports illustrate that approximately 59% of U.S. adults are worried about being able to afford prescription medications, while approximately 43%

---

[1] Dopamine, The Cleveland Clinic, last updated March 23, 2022, available at https://my.clevelandclinic.org/health/articles/22581-dopamine.
[2] Dopamine: The pathway to pleasure, Harvard Health Publishing, Harvard Medical School, available at https://www.health.harvard.edu/mind-and-mood/dopamine-the-pathway-to-pleasure.
[3] *Id.*
[4] What is the Role of Dopamine in ADHD?, Healthline, last medically reviewed on October 10, 2024, available at https://www.healthline.com/health/adhd/adhd-dopamine#takeaway.
[5] Scott Gottlieb, Methylphenidate works by increasing dopamine levels, PubMed Central, National Library of Medicine, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC1119521/.
[6] The Neupro Patch, Neupro (rotigotine transdermal system), available at https://www.neupro.com/parkinsons-disease/rotigotine-dopamine-agonist.

of adults have failed to take their medication as prescribed due to costs, and have resorted to other cost-saving measures such as skipping doses and purchasing over-the-counter drugs instead.[7]

19. It is no surprise, then, in a world where diagnosed and undiagnosed neurological conditions like ADHD are prevalent amongst adults and children alike,[8] the appeal for affordable and accessible dopamine-inducing products in the consumer marketplace soars.

## II. <u>Ledisa's Advertising and Marketing of the Dopamine Patches</u>

20. Ledisa touts itself as "a natural wellness patch brand dedicated to reshaping how you support your body every day."[9] Ledisa's stated mission is "to build products that feel gentle, thoughtful and truly useful" and to create "solutions made to help people feel more aligned with their bodies."[10]

21. Defendant sells a variety of transdermal wellness patches advertised as "effective patch-based solutions designed to support your entire day" and "a smarter, more effortless way to support wellness." Alongside Ledisa's Dopamine Patches, Defendant's other patches in its wellness patch collection including the Berberine Patches, Energy Patches, Relax Patches, and Sleep Patches.

22. Ledisa's transdermal patches are adhesive stickers that supposedly work by delivering ingredients through the wearer's skin—"an incredibly effective delivery system."[11]

---

[7] Audrey Kearney, *et al.*, Public Opinion on Prescription Drugs and Their Prices, <u>KFF</u>, published March 31, 2026, available at https://www.kff.org/health-costs/public-opinion-on-prescription-drugs-and-their-prices/.
[8] Attention-Deficit/Hyperactivity Disorder (ADHD), <u>National Institute of Mental Health</u>, available at https://www.nimh.nih.gov/health/statistics/attention-deficit-hyperactivity-disorder-adhd.
[9] Ledisa, https://ledisa.com/.
[10] Ledisa, Who We Are, https://ledisa.com/pages/about-us.
[11] Ledisa, https://ledisa.com/.

Defendant boasts its transdermal patches as "supplements, made simple" with "no pills, no powders"—"just peel, stick, and go."[12]

23. In 2025, Ledisa began selling its Dopamine Patches on its official website, Ledisa.com, and in other online platforms such as Amazon.

24. On the front and center of Ledisa's Dopamine Patches' product packaging, in the largest text most noticeable to consumers, is the label "**Dopamine Patches**" in bolded black lettering contrasting against the orange background.




25. Underneath the prominent "Dopamine" label in smaller white font against a darker orange banner is the product description: "Science Backed Formula."

26. In the online product listing on Ledisa's website, Ledisa states the Dopamine Patches will "Control Your Mood" and "Transform Your Energy."

[12] *Id.*

27. As a consumer scrolls through the image carousel within the product listing, Ledisa purports to display comparison images of users before and after using Ledisa's Dopamine Patches:







28. Ledisa's website is replete with numerous false and misleading advertising claims that the Ledisa Dopamine Patches will "support" increased dopamine production and provide positive mood, energy, and neurological benefits.

29. For example, Defendant's website prominently displays a large banner advertisement underneath the Dopamine Patches product listing that states "Finally Take Back Control of Your Mood and Energy with the World's First Dopamine Support Patch" and promises benefits including "better mood," "more energy," and "clearer mind."




30. Defendant's website claims that Ledisa's Dopamine Patches will make users "feel motivated, not drained" and provides "complete dopamine support" so that a user's "brain gets the fuel it needs." Defendant also represents that the Dopamine Patches will "stabilize" user's

energy—"no more mood swings, crashes, or afternoon slumps." Defendant further promises the Dopamine Patches provide "more confidence, clarity, and motivation—as you feel lighter and your spark comes back."

31. Defendant's website claims that it takes only "1 Patch per Day to Reclaim Your Mood and Motivation" and that "supporting your dopamine naturally and boosting your energy has NEVER been easier."

32. Defendant boldly states that Ledisa's Dopamine Patch is the "one easy choice" to "feeling motivated, energized and clear":




33. On its Instagram page, Ledisa doubles down on its website representations by stating that its Dopamine Patch "dials up your dopamine, naturally."




34. Defendant's label representations and online advertisements collectively induce consumers like Plaintiff to believe that the Dopamine Patches contain dopamine as the key ingredient and will work as effectively as dopamine-containing and/or dopamine agonist medications to provide the advertised neurological health benefits.

35. Unfortunately, however, Defendant's representations that its patches contain "dopamine" and will work as advertised are nothing but a sham because the herbal ingredients in the patches are not as effective at providing the same benefits as the actual dopamine chemical or a dopamine agonist via transdermal delivery.

36. Indeed, Defendant's ingredient list reveals that its Dopamine Patches do not in fact contain any dopamine. Instead, the patches contain macuna pruiens, 5-HTP, lion's mane extract, l-tyrosine, rhodiola extract, and vitamin b6.

37. Throughout the liability period as defined below, Defendant has engaged in an advertising and marketing campaign that falsely represents that its Dopamine Patches actually

contain “dopamine” and thus, provides the positive mental and mood benefits widely recognized and associated with the dopamine chemical or dopamine agonist prescription medications.

38. As a result of this deception, Defendant sold numerous units of the Dopamine Patches through its website and other online channels.

39. Plaintiff and members of the Classes have been, and will continue to be, deceived or misled by Defendant’s deceptive advertising claims. Each Class Member purchased and used the Dopamine Patches during the liability period and in doing so, read and considered the advertising claims on the Dopamine Patches’ packaging and marketing materials and based their decision to purchase the Dopamine Patches on the advertising claims. Defendant’s advertising claim that the Dopamine Patches contained dopamine was not only a material factor, but the only factor in influencing Plaintiff’s decision to purchase and use the Dopamine Patches.

40. Plaintiff and the Class Members would not have purchased the Dopamine Patches had they known that they did not contain any dopamine, and thus, would not provide any of the cognitive benefits associated with dopamine.

## III. Ledisa’s Advertising Claims for the Dopamine Patches are False and Deceptive

41. Despite this prominent marketing and advertising, Ledisa’s Dopamine Patches do not contain any dopamine and do not “support” dopamine production as promised because its herbal ingredients are ineffective at providing the same benefits as the actual dopamine chemical or a dopamine agonist via transdermal delivery.

42. Ellen Walker, PhD, chair of the department of pharmaceutical sciences at Temple University School of Pharmacy, told SELF magazine "[t]hat they call them dopamine patches is complete false advertising, which is, I think, a very unfair thing to consumers."[13]

43. In the same article, board-certified critical care pharmacist and clinical pharmacist consultant, Niousha Nader, PharmD, explained that although the dopamine patches are named after the chemical messenger dopamine that helps humans feel pleasure and encourage motivation, the patches themselves do not actually contain dopamine, but rather, vitamins and other nutrients.[14]

44. When asked about the efficacy of the herbal ingredients included in natural transdermal patches like Ledisa's Dopamine Patches, psychiatrist Nissa Keyashian, MD, stated in an article that "[a]lthough limited data suggest some of the ingredients in these products may slightly help mood and cognitive symptoms, there is no strong evidence that they are effective and safe medications for ADHD."[15]

45. An article in GlobeNewswire explained the scientific limitations of the transdermal delivery of herbal ingredients versus pharmaceutical formulations in general:

> Scientific research shows that the skin acts as a strong barrier designed to prevent the entry of most external substances. Effective transdermal delivery of therapeutic compounds typically requires advanced pharmaceutical formulation techniques. These may include penetration enhancers, microneedle systems, or specialized encapsulation technologies developed through extensive research.
>
> Prescription transdermal patches, such as nicotine or hormone replacement patches, undergo years of development to achieve consistent and measurable delivery. **Herbal wellness patches containing botanical ingredients face different**

---

[13] Women Explain Why They're Self-Medicating with Dopamine patches for ADHD, SELF, March 13, 2026, available at https://www.self.com/story/dopamine-patches-for-adhd.

[14] *Id.*

[15] Can Dopamine Patches Improve Focus, Mood, and Energy?, Everyday Health, April 20, 2026, available at https://www.everydayhealth.com/healthy-living/can-dopamine-patches-improve-focus-mood-energy/.

**scientific challenges, and published research does not currently demonstrate reliable transdermal delivery of many plant compounds at therapeutic levels.**[16]

46. As illustrated above, whether Ledisa's Dopamine Patches contain "dopamine" and whether they can provide the advertised health benefits can be determined with objective factual evidence.

47. The advertising and marketing of the Dopamine Patches as containing "dopamine" is in a prominent place, front and center on the label of the products, demonstrates Defendant's awareness that this claim about the product's composition is material to consumers.

48. Defendant's deceptive representations are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchasing decisions.

49. In making the false, misleading, and deceptive representations described herein, Defendant knew understood and believed that consumers would purchase a product advertised as containing "dopamine" over comparable products that are not advertised as containing "dopamine."

50. As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations, Defendant caused Plaintiff and the Class Members to suffer ascertainable loss in that the Classes:

a. Paid a sum of money for a product that was not what Defendant represented;

b. Were deprived of the benefit of the bargain because the Dopamine Patches they purchased was different from what Defendant warranted; and

---

[16] Rejuvacare Ozempatch Ingredients Examined: 2026 Verified Consumer Reports of Herbal Weight Loss Patch Formulaiton Claims, Global Newswire, January 10, 2026, available at https://finance.yahoo.com/news/rejuvacare-ozempatch-ingredients-examined-2026-122800981.html (emphasis added).

c. Were deprived of the benefit of the bargain because the Dopamine Patches they purchased had less value than what Defendant represented.

51. Had Defendant not made the false, misleading, and deceptive representations, Plaintiff and the Class Members would not have purchased the Dopamine Patches at all.

52. Consequently, Plaintiff and the Class Members have suffered an injury in fact and ascertainable loss of money or property as a result of Defendant's wrongful conduct.

## IV. Plaintiff's Experience

### A. Danielle Crisci

53. On approximately January 1, 2026, Plaintiff Danielle Crisci purchased the Ledisa Dopamine Patches on Defendant's website.

54. Plaintiff Crisci read Ledisa's website claims and the front label of the Dopamine Patches' product packaging, specifically, Defendant's representation that the Dopamine Patches contained "dopamine."

55. Plaintiff Crisci purchased the Dopamine Patches reasonably believing that she was receiving a transdermal patch that actually contained dopamine and its associated health benefits.

56. Plaintiff Crisci was caused to make her purchasing decision by Defendant's false and misleading misrepresentations that the Dopamine Patches did in fact contain dopamine.

57. Had Plaintiff Crisci known that Ledisa's Dopamine Patches did not actually contain any dopamine, were ineffective, and would not work as advertised, she would not have purchased the Dopamine Patches.

## V. Online Consumer Complaints About Ledisa's Dopamine Patches

58. Ledisa is well aware of widespread consumer dissatisfaction arising from Ledisa's false and misleading advertising of the Dopamine Patches.

59. Plaintiff's experience is far from being an outlier. Below is a sampling of the online consumer complaints concerning Ledisa's Dopamine Patches:

a. "Unfortunately, this does not work at all very disappointed. Wasted money." (Amazon)

b. "Didn't do what they advertised!" (Amazon)

c. "Dopamine Patch Unsuccessful, not risk free! I tried the dopamine patch out and it made me anxious, agitated, and jittery. Multiple of my friends tried too and felt the same. . . Do not waste your money on the dopamine patches, they do not help at all!!" (Trustpilot)

d. "False advertising and lied regarding full refunds if not satisfied." (BBB)

e. "I am like the rest, extremely disappointed in the patches. They do NOT work…" (Facebook)

f. "I will never refer anyone to ledisa, they do not work and they promise to back their product which is a lie…" (Facebook)

## CLASS ALLEGATIONS

60. Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action on behalf of herself and Classes of similarly situated persons defined as follows:

**Nationwide Class**:
All persons in the United States who, during the applicable statute of limitations, purchased Ledisa Dopamine Patches.

**New Jersey Class**:
All persons in New Jersey who, during the applicable statute of limitations, purchased Ledisa Dopamine Patches.

61. Excluded from the Classes are Defendant, any entities in which they have a controlling interest, any of their parents, subsidiaries, affiliates, officers, directors, employees and members of such persons' immediate families, and the presiding judge(s) in this case and their staff. Plaintiff reserves the right to expand, limit, modify, or amend this class definition, including, without limitation, the addition of one or more subclasses, in connection with her motion for class

certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

62. **Numerosity**: The proposed Classes are numerous such that joinder is impracticable. Upon information and belief, and subject to class discovery, the identities of Class Members are within the exclusive knowledge of and can be ascertained only by resort to Defendant's records. The proposed Classes are also sufficiently ascertainable because Defendant has the administrative capability, through its computer systems and other business records, to identify all members of the proposed Classes, and such contact information is not otherwise available to Plaintiffs.

63. **Commonality**: The questions here are ones of common or general interests such that there is a well-defined community of interest among the proposed Class Members. Such common legal or factual questions include, but are not limited to:

a. Whether Ledisa engaged in unfair, fraudulent, and unlawful business practices;

b. Whether Ledisa engaged in deceptive acts or practices and false advertising under the laws asserted;

c. Whether Ledisa's conduct constitutes violations of the laws asserted;

d. Whether Plaintiff and the Classes were harmed by Ledisa's misrepresentations;

e. Whether Ledisa was unjustly enriched;

f. Whether Plaintiff and the Classes have been damaged, and if so, the proper measure of damages;

g. Whether Plaintiff and the Classes are entitled to injunctive, declaratory relief, or other equitable relief; and

h. Whether Plaintiff and the Classes are entitled to reasonable attorneys' fees and costs.

64. **Typicality**: Plaintiff's claims are typical of the claims of other Class Members in that they arise out of the same wrongful business practice by Defendant, as described herein.

65. **Adequacy of Representation**: Plaintiff is more than an adequate representative of the proposed Classes in that she has suffered ascertainable loss and damages because of Defendant's improper business practices. Additionally:

a. Plaintiff is committed to the vigorous prosecution of this action on behalf of herself and all others similarly situated and has retained competent counsel experienced in the prosecution of consumer class actions;

b. There is no conflict of interest between Plaintiff and the unnamed Class Members;

c. Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

d. Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

66. **Predominance and Superiority**: Common questions of fact or law concerning Defendant's liability to all Class Members predominate over any questions affecting only individual Class Members. Plaintiff's proposed class action is the superior method for resolving this dispute because it is impracticable to bring proposed Class Members' individual claims before the Court, especially where, as here, individual Class Members' damages are relatively small. Class treatment permits many similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that

numerous individual actions would engender. The benefits of the class action mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

**FIRST CLAIM FOR RELIEF**
**Violation of the New Jersey Consumer Fraud Act - N.J. Stat. Ann. § 56:8-1, *et seq*.**
**(Asserted on Behalf of Plaintiff and the New Jersey Class)**

67. Plaintiff repeats and re-alleges the above allegations as if fully set forth herein.

68. This cause of action is brought under New Jersey's Consumer Fraud Act, § 56:8-1, *et seq.* (the "NJCFA").

69. Ledisa is engaged in "sales" of "merchandise," that is, Dopamine Patches, within the meaning of the NJCFA. § 56:8-1(c) and (e).

70. The NJCFA makes unlawful "[t]he act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise…" N.J. Stat. Ann. § 56:8-2.

71. Ledisa violated the NJCFA by misrepresenting on its product packaging, website, and marketing materials that its Dopamine Patches contain dopamine and support dopamine production, when in reality, they contain no dopamine whatsoever but only herbal ingredients that are ineffective at providing the same benefits as the actual dopamine chemical or a dopamine agonist via transdermal delivery.

72. Ledisa's affirmative misrepresentations regarding the true nature and benefits of its Dopamine Patches were material to Plaintiff and the New Jersey Class members.

73. Plaintiff and the New Jersey Class had no way of discerning Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

74. As a direct and proximate result of Ledisa's deceptive, misleading, and unlawful acts and practices, Plaintiff and the New Jersey Class suffered an ascertainable loss in that they paid more for the Dopamine Patches than they otherwise would have but for Ledisa's false and misleading advertising. Accordingly, they have suffered and will continue to suffer actual damages.

75. Plaintiff and the New Jersey Class are entitled to relief including, but not limited to, actual damages, mandatory treble damages, injunctive relief, and/or attorney's fees and costs.

## SECOND CLAIM FOR RELIEF
**Unjust Enrichment**
**(Asserted on Behalf of Plaintiff and the Nationwide and New Jersey Classes)**

76. Plaintiff repeats and re-alleges the above allegations as if fully set forth herein.

77. To the detriment of Plaintiff and the Classes, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

78. Plaintiff and the Classes conferred a benefit on Defendant in the form of payment for the Dopamine Patches.

79. Defendant unfairly, deceptively, unjustly, and/or unlawfully seized and accepted those benefits which, under the circumstances, would be unjust to allow Defendant to retain.

80. Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

81. Plaintiff and the Classes, therefore, seek disgorgement of all wrongfully obtained money received by Defendant as a result of its inequitable conduct as more fully stated herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and the Classes, seeks judgment in an amount to be determined at trial as follows:

a. Certifying the Classes as requested herein, appointing Plaintiff as Class Representative, and appointing her counsel as Class Counsel;

b. Declaring Defendant's misconduct alleged herein to be unlawful;

c. Awarding monetary damages and mandatory treble damages in an amount according to proof;

d. Ordering Defendant to disgorge and make restitution of all monies Defendant acquired by means of the unlawful practices set forth above;

e. Awarding Plaintiff and the Classes reasonable attorneys' fees and costs of suit;

f. Awarding pre-judgment and post-judgment interest; and

g. Granting any other relief as this Court may deem just, proper, and equitable.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all claims so triable.

**LITE DEPALMA GREENBERG & AFANADOR, LLC**

Dated: August 18, 2026

*/s/ Bruce D. Greenberg*

Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

**KALIELGOLD PLLC**
Sophia G. Gold
490 43rd Street, No. 122
Oakland, California 94609
Telephone: (202) 350-4783
sgold@kalielgold.com

Jeffrey D. Kaliel
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4783
jkaliel@kalielpllc.com

*Attorneys for Plaintiff and the Putative Classes*